UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**JEFFREY HOUSE,**

**Plaintiff,**

**v.** **Case No. 24-CV-1456**

**CAROLINA NAVARRO, et al.,**

**Defendants.**

---

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Jeffrey House sues Racine County child protective services workers, Carolina Navarro, Michelle Pederson, and Marie Froh, under 42 U.S.C. § 1983 alleging they violated his Fourteenth Amendment rights by placing House's three minor children in foster care in September 2021. (Am. Compl., Docket # 6.) House alleges that by placing his children in foster care, the defendants interfered with his familial relations in violation of his right to both substantive and procedural due process. Defendants move for summary judgment in their favor on House's claims. (Docket # 30.) For the reasons explained below, the defendants' motion for summary judgment is granted and the case is dismissed.

## INITIAL MATTERS

As an initial matter, as required by Civil L.R. 56(a)(1)(A), the defendants provided notice to House, who appears *pro se*, that Defendants' factual assertions supported by admissible evidence will be accepted as true unless House submits his own admissible evidence contradicting the factual assertions. (Docket # 30 at 1–6.) In response to the defendants' proposed findings of fact, however, House objects to only three of Defendants'

proposed facts—numbers 18, 27, and 28—but fails to support his objections with citations to admissible evidence. (Docket # 41.) Further, subsequent to the filing of Defendants' materials in reply, House submitted two additional documents responding to Defendants' reply to House's response to the defendants' proposed findings of fact. (Docket # 48; Docket # 49.) Defendants object to these filings as unauthorized sur-replies and move to strike the documents from the record. (Docket # 50.) House responds to Defendants' objection, arguing that Defendants' letter request to strike was not in the form of a motion as required by the local rules and asserts that his submitted documents are acceptable under the federal rules to challenge the defendants' summary judgment motion. (Docket # 51.)

Given House's *pro se* status, I will overlook the form in which House provides his responses to the defendants' proposed findings of fact. Factual assertions, however, must be supported by admissible evidence. Thus, to the extent House fails to properly dispute the defendants' proposed findings of fact, they are accepted as true for purposes of this motion.

**FACTS**

On August 30, 2021, the Racine County Human Services Department ("RCHSD") received a Child Protective Services ("CPS") report regarding Alexus Moralez allegedly neglecting her three minor children—A.H., J.H, and I.H. (Declaration of Marie Froh ("Froh Decl.") ¶ 9, Ex. 1, RCHSD Initial Assessment Report at 10, Docket # 32-1; Froh Decl. ¶ 10, Ex. 2, Aug. 30, 2021, CPS Report at 2, Docket # 32-2.)[1] The report indicated

[1]Although House does not object to the bulk of Defendants' proposed findings of fact, I note that Defendants rely principally on several reports produced by the RCHSD appended to the declaration of Marie Froh. While a party may rely on record materials, including documents, on summary judgment, the record materials must still be admissible as evidence at trial. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955 (7th Cir. 2021). Thus, a court cannot consider inadmissible hearsay on summary judgment. *Id.* at 955–56. As to the RCHSD reports, Froh avers that she is a Case Manager and Supervisor with RCHSD and that the appended reports are business records created in the ordinary course of RCHSD business to document and preserve information pertinent to a given matter. (Froh Decl. ¶¶ 6, 8.) I agree that these records are admissible under

concerns that Moralez smoked marijuana, heroin, and took pills believed to be Percocet that were not prescribed to her, and suffered from mental health issues such as schizophrenia and bipolar disorder. (Initial Assessment Report at 10.) The CPS report also stated that the children's basic needs were not being met. (CPS Report at 2.) On August 31, 2021, Initial Assessment Workers Michelle Pederson and Alicia Mojica attempted to make contact with Moralez at her Racine residence. (Initial Assessment Report at 11.) While Moralez responded to the door, she advised Pederson and Mojica that she had been bathing the children and needed to get them dressed before allowing the workers into the home. (*Id.*) Pederson and Mojica waited several minutes but Moralez never returned. (*Id.*) Pederson left a business card in the door to which Moralez left a message the following day. (*Id.*) Pederson attempted to reach Moralez by telephone on September 3, 2021, and through a home visit on September 14, 2021, but was unsuccessful. (*Id.*)

The RCHSD report incorporates Racine Police Department Sergeant Juan Garcia's Report #21-037445. (*Id.*)[2] Sgt. Garcia reported that on September 15, 2021, at approximately 11:41 p.m., the Racine Police Department received a call to respond to Moralez's residence in reference to a civil complaint regarding a couple arguing. (*Id.*) Sgt. Garcia and Officer Schoenbeck responded to the scene and observed an SUV parked one house east of Moralez's residence with all four doors wide open. (*Id.*) Upon approaching the vehicle, the officers observed two small children seated in the rear seats but not strapped in.

---

Fed. R. Evid. 803(6). While the reports themselves are admissible, the reports contain multiple levels of hearsay. When multiple levels of hearsay are present, an exception must apply to each level. *McCormick v. Goebel*, 655 F. Supp. 3d 748, 758 (N.D. Ind. 2023). I will address statements as they arise; however, to the extent the reports rely on statements made by Navarro, Pederson, and Froh, these constitute party opponent statements and thus are not hearsay under Fed. R. Evid. 801(d)(2).

[2] Sgt. Garcia's police report represents an additional hearsay layer in the RCHSD report. However, to the extent the report incorporates the officer's firsthand observations, it is admissible under Fed. R. Evid. 803(8)(A)(ii). *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013).

(*Id.*) The officers then approached the residence and identified themselves as police but received no response from anyone inside. (*Id.*) The officers entered the residence and found Moralez in the living room on the couch, appearing "dazed and confused" as if she was just waking up. (*Id.*) The officer asked who else was inside with her, and she responded her children. (*Id.*) When asked where the children were, Moralez responded they were sleeping in the bedroom. (*Id.*)

Garica asked Moralez if the children's father lived with them and she stated that he did and identified him as House. (*Id.*) Upon checking the residence for House and the children, the officers observed a young child on the bed in the master bedroom. (*Id.*) House was not present. (*Id.*) The officers retrieved the other two children from the vehicle and returned them to the residence. (*Id.*) During their contact with Moralez, the officers noted she had difficulty staying on task and had trouble answering simple questions such as her children's dates of birth. (*Id.*) Moralez informed the officers that her sleep medication made her tired. (*Id.*) Garcia asked Moralez what medications she took and she showed him Alprazolam and Vyvanse, and later Zolpidam. (*Id.*) Moralez set the youngest child, her 10-month-old daughter, on the couch unattended, causing her to fall. (*Id.*) Moralez kept closing her eyes and appeared to be falling asleep while holding the child. (*Id.* at 11–12.)

Garcia asked Moralez to call House and find out where he was. (*Id.* at 12.) Moralez did so and a male voice answered the phone. (*Id.*) Garcia told Moralez to ask House his location but House hung up the phone. (*Id.*) Despite Moralez calling House back several times, the phone went to voicemail. (*Id.*) Garcia asked Moralez if she had any family members that would take care of the children because he did not believe she was capable of

watching them and she stated she had no one. (*Id.*) The officers called the Racine County Human Services After Hours Worker, Navarro, to respond to the residence. (*Id.*)

Upon arriving at the home, Navarro tried waking Moralez by loudly calling her name several times but Moralez continued to sleep and her body would randomly jerk. (*Id.*) The 10-month-old was sleeping next to Moralez on the couch. (*Id.*) Garcia physically shook Moralez and rubbed his knuckles into her chest, causing her to open her eyes and appear confused. (*Id.*) Both Garcia and Navarro attempted to rouse Moralez, but she kept falling asleep. (*Id.*) Navarro explained to Moralez that the children could not stay in the home due to her condition. (*Id.*) Like Garcia, Navarro asked Moralez whether any relatives were available to take the children, and she shook her head "no." (*Id.*) Navarro told Moralez that she was taking temporary physical custody of the children; however, Moralez fell back to sleep. (*Id.*)

Navarro noted that the home was messy, cluttered, and unkempt with sticky floors, and clothes, toys, shoes, trash, diapers, and various household objects all over the floors and furniture. (*Id.*) She observed cigarette butts on the floor of the bedroom; dirty dishes, garbage, and old food sitting out in the kitchen; many choking hazards within reach of the children; and stacked items on the floors throughout the home. (*Id.*) Navarro transported the children to their respective foster placements. (*Id.*)

A short time later, Navarro received a call from House indicating that he was looking for his children. (*Id.*) Navarro advised House that the children were placed in foster care due to Moralez providing no information for relatives. (*Id.*) House demanded to know where to pick up his children; however, Navarro told him he would need to wait until the

assigned worker spoke with him in depth. (*Id.*) House stated he did not want to wait and that the situation with Moralez had nothing to do with him. (*Id.*)

On September 16, 2021, Mojica met with House and his mother, Earlene House, who came to the RCHSD inquiring about the children's location. (*Id.*) House informed Mojica that he had contacted law enforcement the previous night to conduct a welfare check because he was concerned about Moralez's Facebook post stating that she was depressed. (*Id.*) House stated that Moralez suffers from schizophrenia and had not slept for three days. (*Id.*) House denied living at Moralez's home, stating he lived with his grandmother. (*Id.*) House indicated he hoped the children could be released to him. (*Id.*)

House was asked about his criminal history and he mentioned a conviction from when he was 15-years-old and stated he was placed on parole last month. (*Id.*) Upon checking public court records, Mojica learned that House had an open misdemeanor case pending for battery/domestic abuse and disorderly conduct/domestic abuse where Moralez was the alleged victim. (*Id.*) Mojica further learned that a condition of House's bond was to have no contact with Moralez, including her person, property, residence, or family. (*Id.* at 12–13.)

Also on September 16, Pederson contacted Moralez to ensure that she was aware of what had occurred earlier that morning. (*Id.* at 13.) During the call, Pederson could hear yelling in the background and Moralez informed Pederson that House and his mother were present at her home. (*Id.*) Pederson informed Moralez that further assessment was needed to ensure that the children could be safety reunified with her, however, based on her behavior the previous night and her inability to provide adequate and safe supervision of her children or produce an appropriate relative, a hearing would occur the following morning to

determine probable cause to remove the children. (*Id.*) Pederson contacted House to discuss his current criminal case and the no-contact order with Moralez. (*Id.*) Pederson informed House that further assessment was needed to determine the children's safety in his care given the pending domestic violence charges and no-contact order with Moralez and their children. (*Id.*)

A probable cause hearing was held on September 17, 2021, before Judge David W. Paulson in the Racine County Circuit Court. (Froh Decl. ¶ 12, Ex. 4, RCHSD Case Notes, Docket # 32-4.) Pederson was present, as was House and Moralez. (*Id.*) After both parents arrived, Judge Paulson stated that he would hear from each person separately due to the no-contact order. (*Id.*) He asked House to wait outside, while he heard first from Moralez. (*Id.*) Judge Paulson noted that when the deputy went to retrieve House for his testimony, House had left the building. (*Id.*) Judge Paulson ultimately found probable cause for removal. (Froh Decl. ¶¶ 13–15, Exs. 5–7.)

On September 28, 2021, House was able to return to criminal court to have his bond amended to allow him contact with the children so long as Moralez was not around. (Initial Assessment Report at 13.) The RCHSD filed recommendations to the Court regarding the CPS matter of House's three children on April 28, 2022, and May 27, 2022. (Froh Decl. ¶ 17, Ex. 9, Docket # 32-9.) The RCHSD recommended that the children be placed with their maternal grandmother as placement in the home was contrary to the children's welfare as "neither parent has completed any [of] the recommended services and shown the appropriate behavior changes in order to have the children safely returned to their care." (*Id.* at 3.) A hearing was held before Judge Paulson on May 31, 2022, in which the Court found that the children were in need of protection or services based on CHIPS/Neglect pursuant

to Wisconsin Statute 48.13(10); that placement in the home was contrary to the children's welfare as neither parent had completed any of the recommended services and shown the appropriate behavior changes in order to have the children safely returned to their care; and, both the mother and the father were living with family members and did not have adequate housing for the children. (Froh Decl. ¶ 16, Ex. 8, Docket # 32-8.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a

rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**ANALYSIS**

House alleges that Navarro, Pederson, and Froh violated his familial rights protected by the Fourteenth Amendment by placing his three children in foster care in September 2021, and by initiating court proceedings that resulted in the May 31, 2022 Order finding that his children were in need of protection or services under Wisconsin law. (Docket # 6.) House sues the defendants pursuant to 42 U.S.C. § 1983. To succeed on a § 1983 claim, House must prove (1) the deprivation of a right secured by the Constitution or federal law and (2) that the defendants were acting under color of state law. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016).

*1. Substantive Due Process Claim*

Once again, House alleges that the defendants violated his substantive due process rights under the Fourteenth Amendment by placing his children in foster care, thus interfering with his familial relationships. The Supreme Court has long recognized as a component of substantive due process the right to familial relations. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). While a "natural parent's" liberty interest "in the care, custody, and management of their child" is "fundamental," *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), "the constitutional right to familial integrity is not absolute," *Brokaw*, 235 F.3d at 1019. This liberty interest in familial integrity "'is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents.'" *Id.* (quoting *Croft v. Westmoreland Cnty. Child. & Youth*

*Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). "Thus, a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." *Id.*

In balancing these competing interests, "courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.*; *see also Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) ("To achieve the proper balance, caseworkers must have 'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse before they may take a child into protective custody.") (internal citation omitted). A reasonable suspicion requires "more than a hunch but less than probable cause." *Hernandez*, 657 F.3d at 478.

House does not contest that RCHSD received a CPS report regarding his children's mother, Moralez, on August 30, 2021, suspecting her of neglecting House's three children. Nor does House dispute that Moralez was in an unfit state to care for the children on September 15, 2021, as described by the RCHSD workers and police officers in RCHSD's Initial Assessment Report. Rather, House argues that *he* never neglected his children. (Pl.'s Proposed Findings of Fact ¶ 4, Docket # 42.) In fact, House asserts that it was he who contacted law enforcement on September 15 to conduct a welfare check on his children and Moralez. (*Id.* ¶ 5.) House argues that Moralez's situation "had nothing to do with him" (Initial Assessment Report at 12) and he should not be held responsible for Moralez's neglect (Docket # 40 at 4). House contends that he was willing and able to take custody of his children on the night of September 15 and he communicated the same to RCHSD. (*Id.* at

2.) Thus, House argues Defendants violated his constitutional rights by placing the children in foster care instead of releasing them to him.

I disagree. The undisputed evidence supports that the defendants had reasonable suspicion to take the children into protective custody. Prior to the emergency removal on September 15, 2021, RCHSD had very recently received a CPS report on August 30, 2021, stating that Moralez's three young children were not being fed, bathed, or dressed in clean clothes; that Moralez was utilizing illegal drugs and smoked marijuana in front of the children; that Moralez kept marijuana on a table within the children's reach; and that the home was dirty, with food on the floor and trash that needed emptying. (CPS Report at 2.) Additional attempts to follow-up with Moralez in September were unsuccessful. (Initial Assessment Report at 11.)

Then, on the night in question, law enforcement were called to Moralez's home based on a complaint of yelling coming from the residence. (*Id.*) When law enforcement arrived, Moralez was observed in an impaired state and the children in dangerous conditions. (*Id.*) Specifically, the two older children (both under the age of five) were sitting in a vehicle by themselves with the doors wide open at 11:41 p.m. and the 10-month-old child was placed unattended on a couch and fell off of it. (*Id.*) Sgt. Garcia requested Moralez call the children's father, but she could not reach House. (*Id.* at 12.) After Moralez informed Garcia that no other family was available to take the children, Garcia called the after hours worker with RCHSD, Navarro. (*Id.*)

Thus, by the time Navarro arrived at Moralez's residence the night of September 15, 2021, she already had some "definite and articulate evidence giving rise to a reasonable suspicion" that the children had been abused or were in imminent danger of abuse. *See*

*Brokaw*, 235 F.3d at 1019. Further, Navarro herself observed Moralez's impaired state and dangers within the house, including choking hazards within the children's reach and cigarette butts on the floor. (Initial Assessment Report at 12.) Moralez also informed Navarro that no other relatives were available to take the children. (*Id.*) It was then that Navarro transported the children to their respective foster placements. (*Id.*)

House argues that he was available to take custody of the children, that he objected to his children's placement in foster care, and that he communicated this to the CPS worker via telephone. (PPFOF ¶ 3.) He does not dispute, however, that this telephone call with Navarro occurred after the children had already been transported to their foster placements. (Initial Assessment Report at 12.) He does not dispute that Navarro informed him that the children were placed in foster care due to Moralez's assertion that there were no other relatives the children could be placed with. (*Id.*) Nor does he contest that Moralez attempted to call House at Sgt. Garcia's behest but could not reach him. (*Id.*)

When House met with RCHSD the next day, September 16, 2021, regarding his children's placement, it was then that RCHSD learned of House's open misdemeanor domestic abuse case involving Moralez and the bond condition that House have no contact with Moralez and the children. (*Id.* at 12–13.) In their reply brief, Defendants argue that Navarro, who was present at the scene on September 15, 2021, was aware of the no-contact order and thus was not required to place the children with House under those conditions. (Docket # 46 at 7–8.) House argues that the no-contact order could not have influenced the defendants' decision to place the children in foster care because Navarro was unaware of it at the time of the emergency removal on September 15, 2021. (Docket # 48.)

House is correct that RCHSD was not aware of the no-contact order at the time of the emergency removal. Despite Defendants' argument in their brief, the record evidence indicates that RCHSD did not rely on the no-contact order as justification to remove the children from the home and place them into foster care that night. Navarro informed House during their telephone call that the children were being placed in foster care due to Moralez's condition and the lack of available relatives to care for them. (Initial Assessment Report at 12.)

Construing his argument liberally, House seems to assert that once he informed Navarro that night over the telephone that he was available to take the children, she should have immediately turned them over to him rather than making him wait to speak with RCHSD. While House understandably did not want to wait to be reunited with his children, given the totality of the circumstances, it was not unreasonable for RCHSD to wish to speak with House prior to releasing the children to his care. And RCHSD did, in fact, meet with House the next day. It was when House was interviewed by Mojica the next day that RCHSD learned of House's pending domestic abuse case involving Moralez and the no-contact condition of bond. (*Id.*) Also that day, RCHSD learned that House was at Moralez's house in violation of the no-contact order. (*Id.* at 12–13.) Thus, with this further information in hand, it was not unreasonable to deny House placement of the children at that time. For these reasons, House's substantive due process claim fails. Summary judgment is granted in Defendants' favor on this claim.

*2. Procedural Due Process Claim*

House further alleges that Defendants engaged in "sham proceedings" to justify the allegedly unlawful removal and placement of the children. In contrast to a substantive due

process claim, in a procedural due process claim, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Brokaw*, 235 F.3d at 1020 (internal citation omitted). "Thus, a procedural due process claim involves a two-part analysis: First, we determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then we assess what process was due." *Id.*

As stated above, while House's interest in his familial relations is indeed a protected liberty interest, I find that the undisputed evidence supports that the defendants had reasonable suspicion to take the children into protective custody. Thus, the defendants did not deprive House of his protected liberty interest. Even assuming, *arguendo*, that Defendants did deprive House of his liberty interest, the undisputed facts demonstrate that House was not denied due process.

In determining what process is due, the Seventh Circuit has stated that "parental rights cannot be denied without an 'opportunity for them to be heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). The court acknowledged that what "exactly this means is less clear," as the "amount of process due varies with the particular situation." *Id.* The Seventh Circuit has found that "at a minimum," government officials cannot misrepresent the facts in order to obtain the removal of a child from his parents. *Id.* The court further stated that due process "also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances." *Id.* When exigent circumstances are present, however, "government

officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse." *Hernandez*, 657 F.3d at 486; *see also Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (finding that "there is no denial of due process in refusing to grant a full adversary hearing before taking away property or liberty, so long as such a hearing is provided later (as it was here) and there is justification for the delay" and "[w]hen a child's safety is threatened, that is justification enough for action first and hearing afterward").

In this case, the undisputed facts demonstrate exigency existed. The children were young—all under the age of five. Moralez was unable to remain awake despite multiple attempts by both Sgt. Garcia and Navarro to rouse her. House could not be reached, and no other relatives were available to take custody of the children. Navarro did not misrepresent these facts to House; she informed him that the children were placed in foster care that night due to Moralez's condition and her inability to provide information regarding other relatives to care for them.

Furthermore, a hearing was held soon thereafter, on September 17, 2021. House argues that the court incorrectly found that he was complicit in Moralez's actions. (Docket # 40 at 2.) Even assuming this was correct, House does not dispute that he received notice of the hearing, the hearing occurred, and he was given an opportunity to speak. But this is not, however, what the court found. Rather, in finding probable cause to remove the children from their parents' custody, as to House, the judge concluded that the "father and mother have domestic abuse concerns which include an open pending criminal matter for the father who is to be having no contact with the mother or children, yet he has been." (Docket # 32-5 at 2.) In other words, the judge did not attribute Moralez's actions to House;

rather, the judge determined that the children could not remain with House because of the pending domestic abuse charges and the no-contact order. Again, House was present for the hearing when the hearing commenced. House, however, chose not to participate and left the building before it was his turn to speak. On these undisputed facts, House has not shown a deprivation of his right to procedural due process in the removal of his children. Thus, summary judgment is granted in Defendants' favor on this claim.

While the defendants also argue that House's claims are barred by qualified immunity, because I find for Defendants on the merits of House's claims, I need not address it.

## CONCLUSION

House's lawsuit stems from the unfortunate events of September 15, 2021, in which House's three young children were removed from their parents' custody. While House asserts that three CPS workers addressing the children's case denied him his substantive and procedural due process rights under the Fourteenth Amendment, on the undisputed facts of this case, no reasonable jury could return a verdict in House's favor as to his claims. For these reasons, summary judgment is entered in favor of the defendants. House's complaint is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion for Summary Judgment (Docket # 30) is **GRANTED**. House's complaint is dismissed. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 21st day of August, 2026.

BY THE COURT:

____________________________
NANCY JOSEPH
United States Magistrate Judge